UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARION MCVEY,

    Plaintiff,

    v.

SOUTHERN ILLINOIS UNIVERSITY,

    Defendant.

Case No. 12-cv-592-JPG-PMF

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion for summary judgment filed by defendant Board of Trustees of Southern Illinois University ("SIU"), misnamed in the Complaint as Southern Illinois University (Doc. 34). Plaintiff Marion McVey has responded to the motion (Doc. 38), and SIU has replied to that response (Doc. 39).

**I.    Summary Judgment Standard**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production on one of two ways. It may present

evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the non-moving party's case without actually submitting any evidence, *see* Fed. R. Civ. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252.

## II.     Facts

Construed in the plaintiff's favor, the evidence and all reasonable inference that can be drawn from it establish the following relevant facts.

In 1994, SIU employed McVey as an electrician at its Edwardsville, Illinois, campus in the Facilities Management ("FM") department. His employment was subject to a collective bargaining agreement with the International Brotherhood of Electrical Workers ("IBEW"). One of the union jobs was an electrician; there was no position of "light duty" electrician.

A.  McVey's Back Problems Begin

In January 2005, McVey injured his lower back at work. A few months later, his doctor, Dr. Dennis Rademacher, released him to return to work without restrictions. McVey did not ask for any accommodation, and he was able to perform all work assigned to him when he returned.

In July 2005, McVey had a flare up of his back problem when he was not at work. Dr. Rademacher released him again, but only for "light duty." Dr. Rademacher did not provide any specific indication what he considered "light duty" and what restrictions came with that classification. SIU allowed McVey to return to work in the shop rather than in his regular electrician job, but on his first day back at work, he was placed on leave for disciplinary reasons.

Later that year, McVey ran into more disciplinary trouble and was terminated. As part of a settlement agreement, SIU and McVey agreed that McVey would be allowed to return to work in December 2005 but would be permanently reassigned as an electrician in the University Housing Facilities Management ("UHFM") department. McVey was still under the July 2005 "light duty" work restriction from his doctor but did not explicitly request limited duties in the UHFM department and was able to perform all work assigned to him there.

On March 16, 2007, McVey turned in a note from Dr. Rademacher ordering that he continue on "light duty," but again Dr. Rademacher did not identify McVey's specific restrictions. SIU immediately informed McVey there was no "light duty" electrician position and that he would have to go home. Later in the month, Robert Legate, an administrator in the UHFM department, compiled a "Demands of the Job" form for McVey's electrician job, which included

- lifting and carrying:
    - 31 to 40 pounds for up to two hours a day, approximately twice a day;
    - 41-50 pounds less than three times per week, approximately twice a day;
    - 51-60 pounds less than three times per week, approximately twice a day;
    - 61-70 pounds less than three times per month, approximately once a day;

3

- - 71-80 pounds less than three times per month, approximately once a day;
  - 81-90 pounds less than three times per month, approximately once a day; and
  - 91-100 pounds less than three times per month, approximately once a day;
- pushing and hand trucking 200 pounds less than three times per week, approximately two times a day;
- bending or stooping for up to two hours a day; and
- reaching above shoulder level for up to two hours a day.

Legate also indicated that if lifting was necessary, help would be available to perform the lifting. He informed SIU's human resources office that McVey had been performing the full duties of the job of electrician, including the tasks all other electricians perform, with no special accommodations.

A few weeks later, after meeting with Legate and William Misiak, a human resources representative, McVey was returned to his job as electrician. In that meeting, McVey, Legate and Misiak discussed how he could continue to do the job of electrician by "working smart" – dividing his tasks into smaller tasks in order to be able to do them within his restrictions – and being helped by other workers. No one told McVey he was returning to work assigned to "light duty," although McVey believed he was being given a "light duty" assignment that would satisfy his doctor's restrictions. McVey performed all tasks he was assigned without asking for assistance from anyone else, and Legate indicated he would have been given assistance if McVey had felt he needed it.

  B. <u>McVey's Most Recent Back Injury</u>

On March 6, 2008, McVey slipped on some ice at work and reinjured his back. After this accident, SIU completed another "Demands of the Job" form and determined the demands were essentially the same as they were in 2007. About two weeks after McVey's fall, Dr. Rademacher released him to continue on "light duty," again without describing McVey's specific physical limitations. McVey requested the "light duty" accommodation to include being given help in

performing activities he was designated to do and felt he needed help with, possibly including tasks such as lifting, carrying, reaching, bending and stooping.

On March 18, 2008, Legate sent McVey a memorandum refusing to let McVey return to work at that time because there was no "light duty" electrician position and noting that McVey had been performing the full job of electrician in the UHFM department, not "light duty," up to that time. Legate further requested specific limitations from McVey's doctor so SIU could determine whether McVey could perform the full duties of the UHFM department electrician job within those limitations. A week later, Legate sent McVey another memorandum again requesting the specific work restrictions. On April 2, 2008, McVey met with Legate and other SIU representatives, who again asked him for his specific work restrictions. McVey reported that he could perform all of the duties of an electrician if he "worked smart" as he had done in the past, but SIU did not allow him to return to work. Instead, McVey was placed on paid administrative leave for some time but was eventually channeled through the workers' compensation system once SIU reported his injury was work-related.

In letters dated September 8 and 18, 2008, Misiak again noted that McVey had not provided sufficient information to determine whether he could perform the full duty electrician job within his physical limitations. In the September 8, 2008, letter, Misiak noted that this information was also needed for the State of Illinois to determine whether McVey was eligible for temporary total disability ("TTD") payments. As of September 18, 2008, Misiak was still attempting to return McVey to work but was unable to do so because he could not determine whether McVey could perform the tasks of a full duty electrician.

McVey did not provide SIU any specific information about his restrictions until September 23, 2008, when he submitted a physician's statement from Dr. Rademacher. That statement

contained a diagnosis of thoracic vertebral compression fracture (T3) from the March 6, 2008, injury and indicated the injury would inhibit McVey's job performance because it resulted in persistent pain and restriction of motion in the upper back. Specifically, the statement described McVey's restrictions as:

> LIMITED TWISTING, TURNING + BENDING; LIMITED PUSH/PULL/ REACHING; NO REPETITIVE LIFTING; 25 lb. WT LIFTING RESTRICTION.

In early October 2008, at the request of Sherrie Senkfor, SIU's human resources director, Legate prepared a list of "Physical & Mental Job Requirements" for the position of electrician so Senkfor could better understand the electrician position. McVey's immediate supervisor in the UHFM department and the electrician foreman in the FM department reviewed those requirements to make sure they reflected the actual requirements of the job of electrician based on past experience. This document had not existed before this time, and it continues to be applied today to all electricians at SIU. SIU does not have a permanent electrician position where these requirements are not used, that is, they do not have a permanent "light duty" electrician position, although they may have, on occasion, relieved some electricians of some essential requirements on a temporary basis. The requirements contain several functions that McVey could not do alone within Dr. Rademacher's limitations including, among other things:

- reaching or lifting
    - above the chest for two to four hours a day;
    - below the chest for four to six hours a day;
    - overhead for up to two hours a day;
- twisting or bending for two to four hours a day;
- lifting or moving
    - 25 to 50 pounds for up to two hours a day;
    - 50 to 75 pounds for up to two hours a day;
    - over 75 pounds for up to two hours a day;

The narrative sections of the requirements state,

> Employee is expected to lift greater than 25 pounds above the shoulder, multiple times per day, based on the type of work being performed. Employee is expected to lift greater than 50 pounds below the shoulder, multiple times per day, based on the type of work being performed.
>
> * * *
>
> Must be able to lift, transport, set-up, and operate hand tools/power tools including, but not limited to the following: Hand tools/tool box up to 50 pounds in weight [and] hand held power threader up to 30 pounds in weight. . . . Employee must be able to individually load, carry, and perform tasks on a portable extension ladder up to 16 feet in length, and a folding ladder up to 10 feet in length.

There is no indication in the requirements that assistance would be available as there had been in the "Demands of the Job" forms from March 2007 and March 2008. In fact, the requirements indicate the worker must be able to work alone or apart from others for four to six hours a day.

On October 29, 2008, McVey met with Senkfor and other SIU and IBEW officials regarding whether he could perform his job within Dr. Rademacher's restrictions. At that meeting, Senkfor reviewed Dr. Rademacher's limitations on McVey's activities and the October 7, 2008, requirements for the electrician's job, and McVey did not contest the accuracy of either document. However, McVey stated that he was willing to "work smart" by arranging his work to minimize the tasks he was restricted from doing. Nevertheless, he stated that when working with someone else to lift something, he could not guarantee he would be able to lift or hold his end of the piece of equipment.

Around the time of the October 29, 2008, meeting, Senkfor learned McVey had encountered snags with his TTD claim. As a courtesy, Senkfor called McVey's workers' compensation adjustor and assisted in eventually resolving those snags in an effort to get his TTD claim processed.

On November 4, 2008, Senkfor sent McVey a letter stating that SIU could not always limit McVey's tasks to those within his doctor's restrictions due to the nature of the work of an

electrician and could not always provide assistance with lifting more than 25 pounds. She concluded that SIU could not accommodate McVey's request for an electrician job where he would not have to perform activities Dr. Rademacher had prohibited him from doing.

In May 2009, McVey inquired of Senkfor about what requirements he needed to meet in order to return to work as an electrician as SIU and about whether he could return to work as an electrician in the FM department. In response, Senkfor asked McVey to provide any changes in Dr. Rademacher's limitations to his physical activities. She also declined to allow him to work in the FM department because of the agreement settling McVey's 2005 complaint in which he agreed to a permanent reassignment to the UHFM department. McVey never informed SIU that any of his restrictions had changed. McVey currently works as a bus driver.

    C.        <u>Disability Benefits</u>

Following his March 6, 2008, back injury, McVey applied for and received TTD workers' compensation benefits based on that injury. In his 2012 agreement settling this claim, McVey and SIU stipulated he was temporarily totally disabled from March 6, 2008, through February 1, 2012. McVey also applied for and received long-term disability benefits. On his application for those benefits, he stated that beginning March 6, 2008, he was unable to work because of his disability.

    D.        <u>Procedural History</u>

On July 22, 2009, McVey filed a charge of disability discrimination with the Illinois Department of Human Rights ("IDHR"). He received a right to sue letter, and filed this lawsuit on December 7, 2011. McVey's *pro se* complaint alleges SIU violated the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 42 U.S.C. § 12112(b)(5), when it failed to accommodate his request for "light duty," that is, allowing him to "work smart" by "having other workers perform

certain strenuous work activities that would reduce the risk of injury to his back," Compl. ¶ 13, when he sought to return to work after his March 2008 back injury.

SIU asks the Court to grant summary judgment for four main reasons: (1) McVey filed his charge beyond the deadline, (2) McVey is not a qualified individual with a disability, (3) McVey's requested accommodations were unreasonable, and (4) McVey is judicially estopped by his disability claims from asserting he was qualified for the electrician position.

**III.    Analysis**

The ADA provides, in pertinent part, that an employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2007).[1] It also requires employers to provide reasonable accommodations for the physical and mental limitations of qualified employees to enable them to perform the essential functions of their jobs. 42 U.S.C. § 12112(b)(5) (2007).

Before delving into the substance of this case, the Court notes that its analysis is complicated by the parties' use of phrases that have different and special meanings to different people. For example, "light duty" means to McVey the job he was performing when he returned to work after his 2005 accident. He formed this definition based on Dr. Rademacher's releasing him to "light duty" and SIU's subsequent assignment of him to be an electrician in the UHFM department. On the other hand, "light duty" means to SIU a job that demands fewer physical skills and abilities than the regular electrician job. In its opinion, the job McVey was performing

---

[1] The Court refers to the ADA as it stood before the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, which became effective January 1, 2009 and which is not retroactive, *Fredrickson v. UPS, Inc.*, 581 F.3d 516, 521 (7th Cir. 2009). The Court will later address the applicability of the ADAAA to this case.

9

when he came to work in the UHFM department in 2005 was not light duty because it demanded all the physical skills and abilities of the regular job – skills and abilities McVey was actually able to perform from 2005 to March 2008, despite Dr. Rademacher's "light duty" recommendation. Dr. Rademacher, however, had a different understanding of "light duty." He apparently intended to convey – not very clearly – that "light duty" included substantial limitations from a regular, physically demanding job. Those limitations were not made clear until pressed by SIU in the fall of 2008, by which time other differing understandings of "light duty" had been cemented in others' minds. When each of these people speaks of "light duty," they talk past each other. For this reason, the Court will attempt to explain its decision avoiding the phrase "light duty" to the extent possible and relying instead on the underlying understandings of what the phrase means.

A. <u>Date of Charge</u>

SIU first argues that McVey's claim is barred because he did not timely file a charge of discrimination. McVey's July 22, 2009, charge was too late because he filed it with the IDHR more than 300 days after SIU refused to return him to work in the spring of 2008. McVey argues that SIU has waived the defense by failing to raise it in its answer to the complaint (Doc. 14). He also argues that the decision to deny him an accommodation was made on November 4, 2008, when Senkfor sent McVey a letter definitively refusing his request for accommodation, so his charge was timely.

In Illinois, a plaintiff may sue under the ADA only if he files a charge of discrimination within 300 days after the alleged unlawful employment practice occurred. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, (7th Cir. 2004) (citing 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a)). The 300-day period begins to run when there is a "final, ultimate, non-tentative decision" *and* the employer gives unequivocal notice of that decision. *See Flannery*

*v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). A final decision remains final even if an employer later expresses a willingness to change that decision. *Id.* Where the alleged wrong is a failure to accommodate, the failure is a discrete act of discrimination, not an ongoing policy that could justify application of the continuing violation theory to extend the violation through the entire period an accommodation is denied. *See Teague v. Northwestern Mem. Hosp.*, 492 Fed. App'x 680, 684 (7th Cir. Aug. 23, 2012) (citing *Tobin v. Liberty Mut. Ins. Co.,* 553 F.3d 121, 130-31 (1st Cir. 2009); *Mayers v. Laborers' Health & Safety Fund of N. Am.,* 478 F.3d 364, 368 (D.C. Cir. 2007); *Proctor v. UPS,* 502 F.3d 1200, 1210 (10th Cir. 2007)); *EEOC v. Graphic Packaging Int'l, Inc.*, No. 12 C 6371, 2013 WL 3321606, *2 (N.D. Ill. July 1, 2013).

1. Waiver

Federal Rule of Civil Procedure 8(c)(1) provides, "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense. . . ." The purpose of this rule is to give plaintiffs fair notice of the issues the defendant will raise and a chance to rebut them. *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971); *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005). If a defendant fails to plead an affirmative defense, the Court should deem the defense waived only if the plaintiff was harmed by the omission. *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). McVey has not pointed to any prejudice he suffered as a result of SIU's omission of the defense of failure to file a timely charge. It is clear from his competent response to SIU's summary judgment motion that McVey was able to adequately respond to arguments in support of that defense based on the existing pleadings and discovery. Therefore, the Court declines to find SIU has waived this defense.

2. Date of Decision

Nevertheless, SIU is not entitled to summary judgment based on the timing of McVey's

charge of discrimination. There is a genuine issue of material fact regarding whether the "final, ultimate, non-tentative decision" occurred on March 18, 2008, when Legate sent McVey a letter refusing to let him return to work on "light duty" because there was no such position – with subsequent discussions reflecting a willingness to change that final decision – or on November 4, 2008, when Senkfor sent McVey a letter stating, "[W]e cannot accommodate your restrictions and return you to work as an electrician in our Housing Department." Legate's letter did not say definitively that McVey could not come back to work but encouraged McVey to provide details about his restrictions so it could be determined what, if anything, would keep him from performing the full duty electrician job. Legate and other SIU personnel continued to interact with McVey in an effort to determine how his limitations compared to the job duties of an electrician, and a reasonable jury could find that the final decision not to allow McVey to return to work came only on November 4, 2008, once SIU was fully aware of Dr. Rademacher's restrictions. Because a reasonable jury could find SIU made its "final, ultimate, non-tentative decision" on November 4, 2008, it could also find McVey's July 22, 2009, charge was timely.

      B.    <u>Qualified Individual With a Disability</u>

In order to prove a violation of the ADA's reasonable accommodation requirements, a plaintiff must show (1) he is disabled as defined by the ADA, (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations, and (3) the employer failed to make a reasonable accommodation. *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009); *Winfrey v. City of Chi.*, 259 F.3d 610, 614 (7th Cir. 2001). SIU challenges McVey's ability to prove all three elements.

          1.    <u>Disabled</u>

First, SIU claims McVey is not disabled, so he is not entitled to the protection of the ADA.

On the other side, McVey claims he is disabled because of an impairment in his ability to work.

Under the ADA, a person is "disabled" if he:

(a) [has] a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(b) [has] a record of such impairment; or

(c) [is] regarded as having such an impairment.

42 U.S.C. § 12102(2) (2007); *accord Mattice v. Memorial Hosp. of S. Bend*, 249 F.3d 682, 684 (7th Cir. 2001). Where the plaintiff claims his impairment substantially limits the major life activity of working, he must show he is unable to work in a broad range of jobs as opposed to a specific job. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 200 (2002) (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 492 (1999)); *Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 782 (7th Cir. 2007); *Kupstas v. City of Greenwood*, 398 F.3d 609, 613 (7th Cir. 2005); *see* 29 C.F.R. 1630.2(j)(3)(i) (2008). In addition, "except in 'rare cases in which the [plaintiff's] impairments are so severe that [his] substantial foreclosure from the job market is obvious,' he must present 'some evidence of the number and types of other jobs' in the geographic region, from which he would be excluded because of his perceived impairments." *Kupstas*, 398 F.3d at 613 (quoting *EEOC v. Rockwell Int'l Corp.,* 243 F.3d 1012, 1017-18 (7th Cir. 2001)).

While McVey may be unable to perform the work of an electrician, the record is simply devoid of any evidence – or of any allegation, for that matter – that he is unable to perform a broad range of jobs based on the restrictions given by Dr. Rademacher or on McVey's own assessment of his functional abilities. There is simply nothing from which a reasonable jury could conclude that McVey's impairment substantially prevents him from working in a broad range of jobs, as opposed to the specific job of electrician. McVey has admitted as much in his response to SIU's summary judgment motion in which he declines to argue he was disabled because of an actual

13

impairment that substantially limited a major life activity as that was defined in 2008.

Similarly, to the extent McVey believes he is disabled because of his record of impairment or SIU's perception of his impairment, the evidence cannot support a finding of disability. Under these theories of disability, there must be a record or perception that the plaintiff had an impairment that substantially limited his ability to perform the major life activity of working. There is clearly no record of such an impairment. While the record shows McVey had an impairment, it also shows that up until March 6, 2008, he was able to perform the tasks of a full duty electrician without assistance. His record does not show his impairment in any way substantially limited his ability to engage in the life activity of working.

As for the perception prong, McVey points to SIU's participation in McVey's application for TTD benefits under the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/8(b) (2008), as evidence that it believed he could not perform any work existing in a reasonable stable labor market. Under the IWCA, a worker is eligible for TTD "for the period from the date on which the employee is incapacitated by injury to the date that his condition stabilizes or he has recovered as far as the character of the injury will permit." *Freeman United Coal Mining Co. v. Industrial Comm'n*, 741 N.E.2d 1144, 1150 (Ill. App. Ct. 2000). He is entitled to TTD benefits until he reaches his maximum medical improvement. *Interstate Scaffolding, Inc. v. Illinois Workers' Comp. Comm'n*, 923 N.E.2d 266, 271 (Ill. 2010). An employer is obligated to pay TTD weekly if a worker's temporary total incapacity lasts more than three days. 820 ILCS 305/8(b) (2008); *see* 50 Ill. Admin. Code § 7110.70 (2008).

There is no real dispute that McVey was totally incapacitated immediately after he slipped on the ice at work on March 6, 2008, and was not able to return to work under any circumstances until about two weeks later. Therefore, under the IWCA, McVey was entitled to TTD benefits.

14

The fact that Senkfor assisted McVey months later in obtaining these benefits when the processing ran into a snag does not reflect in any way that she, or SIU, regarded McVey as unable to perform a broad range of jobs in November 2008, when it made the final decision not to allow him to return to work. To infer such a belief from efforts to assist McVey in getting the workers' compensation benefits he deserved is not reasonable. Likewise, the 2012 TTD settlement agreement reflected only that at that time SIU thought McVey had reached his maximum medical improvement, not a belief about whether McVey's impairments precluded him from performing a broad range of jobs. No reasonable jury could conclude that Senkfor, or anyone else at SIU, regarded McVey as disabled as that term was defined under the ADA in 2008 simply because they helped him get TTD benefits or settled his TTD claim four years later.

In sum, while McVey's restrictions were limiting, he has presented no evidence that he was limited from performing, that his record indicated he could not perform, or that SIU regarded him as unable to perform a broad range or class of jobs.

2. <u>Qualified</u>

SIU further contests that McVey was not qualified to do the UHFM electrician job because he could not perform some essential functions of the job under Dr. Rademacher's restrictions.

The ADA defines "qualified individual" in relevant part as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2008). To be qualified, he must "satisfy[y] the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires" and "with or without reasonable accommodation, [be able to] perform the essential functions of such position." 29 C.F.R. § 1630.2(m). The plaintiff has the burden of demonstrating he is a qualified individual under the

15

ADA. *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 948 (7th Cir. 2001).

As a preliminary matter, there is no evidence from which a reasonable jury could find that the "Physical and Mental Job Requirements" form was inaccurate as to the relevant essential job functions. McVey suggests the form was a sham since it was created six months after his March 6, 2008, accident and shortly after Dr. Rademacher specified McVey's restrictions. This sequence, however, is too thin a strand for a reasonable jury to infer the form was a sham, especially in light of the fact that McVey did not contest the accuracy of the form in his October 2008 meeting with Senkfor. Furthermore, it is consistent with the "Demands of the Job" form with respect to the amount of heavy lifting the job of electrician required. The only possible substantive difference is the omission of the availability of help in the "Physical and Mental Job Requirements" form, but McVey has admitted that he might be a danger to himself and others that would help him with heavy lifting. Thus, even if the "Demands of the Job" was accepted as the most accurate statement of the physical demands of the job of electrician, McVey would still not be qualified.

It is clear that McVey cannot complete the essential functions of the job of electrician as they are listed on either form without an accommodation. The electrician job requires lifting more than 75 pounds, which is well beyond what Dr. Rademacher believes McVey can safely lift by himself. Even with the help of another worker, McVey cannot shoulder his burden of carrying half that weight.

McVey believes he can perform the essential job functions with an accommodation: "working smart," that is, prioritizing his work and working piecemeal rather than lifting a load all at once. He points to his experience "working smart" before March 6, 2008, to show that he can

16

do the full duty job of electrician with that accommodation.[2]  He has not shown, however, that the heavy lifting tasks are separable so that, for example, an 80-pound lifting task can be accomplished in four smaller 20-pound lifting tasks without constituting repetitive lifting or interfering with the ability to accomplish the job at hand.  For example, the Court doubts a 30-pound hand-held power threader, a requirement of the job, can be operated only by using its component parts separately. To the extent the heavy lifting tasks are not separable and would require assistance from a helper, McVey has admitted that he may be a danger to himself or anyone else who is helping him on a heavy lifting job.

Furthermore, McVey has not shown that his prior "working smart" actually fell within Dr. Rademacher's limitations.  McVey testified that he performed all that was asked of him before March 6, 2008, without asking for assistance, but he did not testify that the things he accomplished did not require lifting more than 25 pounds, repetitive lifting, or too much bending, twisting, pushing, pulling or reaching.  There is a difference between what a worker *can* conceivably do and what his doctor says he *can do safely*, and just because he *can* do a task does not mean he is qualified to do it.  There is simply no evidence from which a reasonable jury could find that before March 6, 2008, McVey did not exceed Dr. Rademacher's later-defined limitations. Without that kind of evidence, McVey's work experience cannot establish his ability to perform the essential job functions of an electrician by "working smart" under Dr. Rademacher's restrictions.

Alternatively, McVey argues that SIU had created a permanent "light duty" position for him beginning in 2005 when Dr. Rademacher first released him to "light duty."  The evidence

---

[2] McVey has not explained how he could be simultaneously working a light duty assignment pursuant to Dr. Rademacher's 2005 restrictions and performing the full duties of an electrician. For the purposes of this part of the qualification analysis, the Court assumes McVey had been working as a full duty electrician before March 6, 2008.

shows, however, that McVey might have been assigned to do less than the full duties of an electrician in early 2005 when he was told to work in the shop the day he returned to work in the FM department. However, there is no evidence of a *permanent* "light duty" electrician position at SIU. No such job exists under the relevant collective bargaining agreement, and despite thinking he was performing "light duty" in the UHFM department from December 2005 to March 2008, McVey actually performed the full duties of the job. Both times he mentioned a "light duty" restriction – after his accidents in 2007 and 2008 – Legate responded that no "light duty" jobs existed in the UHFM department. There is simply nothing from which a reasonable jury could conclude SIU had a permanent "light duty" position McVey was qualified to do.

Even if SIU had lightened McVey's load from December 2005 to March 2008, its temporary accommodation of his impairment did not obligate it to create a permanent position that required fewer than all the essential functions of the job. *See Watson v. Lithonia Lighting,* 304 F.3d 749, 752 (7th Cir. 2002) (employer not obligated to create "limited task" positions simply because it creates temporary ones for recovering injured workers). That kind of accommodation is not reasonable. *See Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996) ("reasonable accommodation does not encompass reallocation of essential job functions").

    C.    <u>2009 Events</u>

In an effort to take advantage of the broader definition of "disabled" under the Americans With Disabilities Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553, McVey argues that SIU discriminated against him anew in May 2009, and that the ADAAA applied to that occurrence. In May 2009, McVey asked what he needed to do in order to return to work and whether he could return in the FM department. Senkfor responded by asking whether Dr. Rademacher's limitations had changed and by declining to assign him to the FM department

18

because of the 2005 settlement agreement requiring McVey to be reassigned to the UHFM department.

Under the ADA after the ADAAA became effective on January 1, 2009, the definition of "disability" did not change, 42 U.S.C. § 12102(1) (2009), but it is now to be broadly interpreted, 42 U.S.C. § 12102(4)(A) (2009). In addition, "major life activities" are now defined explicitly to include such things as performing manual tasks, lifting, bending and working, 42 U.S.C. § 12102(2) (2009). Furthermore, an individual can now be disabled under the "regarded as" category if they have been subject to discrimination because of an actual or perceived impairment regardless of the actual or perceived limitations of that impairment. 42 U.S.C. § 12102(3)(A) (2009).

As a preliminary matter, McVey did not raise in his complaint any issue of discrimination in 2009 and stated in his charge of discrimination that the discrimination took place at the latest on November 4, 2008. Thus, he has not put the events in 2009 at issue in this case.

Additionally, it is clear that the ADA's 2008 definition of disability applies. As discussed above, SIU made its "final, ultimate, non-tentative decision" on November 4, 2008, and the ADAAA is not retroactive to that time. *See Fredrickson v. UPS, Inc.*, 581 F.3d 516, 521 (7th Cir. 2009). The events of 2009 amount to no more than a willingness to reconsider the 2008 decision if McVey could show his restrictions had changed. The 2009 events did not constitute a new, discrete failure to accommodate, so the 2008 definition of disability applies.

However, even had the Court considered the events of 2009 and determined that McVey was disabled under the ADAAA, for the reasons discussed above, there is still no evidence he was qualified to perform all the duties of an electrician with or without a reasonable accommodation. An accommodation of reassignment to the FM department, where McVey was contractually

barred from working, is not reasonable, especially where the electricians in that department have to perform the same essential job functions as the UHFM department. Furthermore, to the extent McVey asserts his impairment does not actually limit a major life function and that he is disabled only because of SIU's perception, SIU is not obligated to accommodate such a disability. *See* 42 U.S.C. § 12201(h) (2009) (employer "need not provide a reasonable accommodation . . . to an individual who meets the definition of disability" solely under the "regarded as" prong of the test).

Because the Court has resolved this case as described above, it need not address SIU's judicial estoppel argument.

### IV. Conclusion

Because there is no evidence from which a reasonable jury can conclude that SIU discriminated against McVey by failing to provide a reasonable accommodation, SIU is entitled to summary judgment. Accordingly, the Court **GRANTS** SIU's motion for summary judgment (Doc. 34) and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: December 16, 2013**

                s/J. Phil Gilbert
                **J. PHIL GILBERT**
                **DISTRICT JUDGE**